IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

FRANKLIN BANK CORPORATION,

Debtor.

Bankruptcy Case No. 08-12924 (CSS)

BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,

Appellant,

v.

GEORGE L. MILLER, *et al.*,

Appellees.

Civil Action No. 13-1713-RGA
Consolidated

MEMORANDUM OPINION

Robert J. Stearn, Jr., Esq. (argued), RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE.

Attorney for Appellant Bank of New York Mellon Trust Company, N.A.

David B. Stratton, Esq., PEPPER HAMILTON LLP, Wilmington, DE; Stephen H. Warren, Esq.
(argued), O'MELVENY & MYERS LLP, Los Angeles, CA.

Attorneys for Appellant Senior Noteholders.

Glenn Brown, Esq., REAL WORLD LAW, PC, Wilmington, DE; Seth B. McCormick, Esq.
(argued), BROWN LEGAL ADVISORS, LLC, Chicago, IL.

Attorneys for Appellant HoldCo Advisors, L.P.

Michael Busenkell, Esq., GELLERT SCALI BUSENKELL & BROWN LLC, Wilmington, DE;
Todd C. Meyers, Esq. (argued), KILPATRICK TOWNSEND & STOCKTON LLP, Atlanta, GA.

Attorneys for Appellee Wilmington Trust Co.

Linda Richenderfer, Esq. (argued), KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, DE.

    Attorney for Appellee George L. Miller.

July 2⅃, 2014

Andrew G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Pending before the Court are five closely related appeals by the Bank of New York

Mellon ("BNYM"), a class of senior debt securities holders ("the Senior Noteholders"), and

HoldCo Advisors, L.P., challenging the Bankruptcy Court's orders entered on September 5, 2013

(1:13-cv-1713 D.I. 13-1)[1] and September 20, 2013 (D.I. 13-2).  Briefing is complete, and the

Court heard oral argument on July 1, 2014.  For the reasons that follow, the Orders of the

Bankruptcy Court are vacated and the case is remanded for further proceedings consistent with

this Opinion.

## I. BACKGROUND

This is a chapter 7 bankruptcy appeal involving the affairs of Franklin Bank Corporation

("FBC"), a defunct Texas-based savings and loan holding company organized under the laws of

the State of Delaware.  The facts are well-known to the parties, and are amply laid out in the

Bankruptcy Court's Order.  (D.I. 13-1).  Several key facts, however, bear mention here because

they are particularly relevant to my view of the case.

The Texas Department of Savings and Mortgage Lending closed FBC's subsidiary on

November 7, 2008, causing FBC to commence a voluntary chapter 7 case in Delaware's

Bankruptcy Court on November 12, 2008.  Prior to filing for bankruptcy, FBC created four

capital trusts (collectively, "Trusts I-IV") and issued four classes of Junior Subordinated Debt

Securities ("Debt Securities") held by an Indenture Trustee.  BNYM is the Indenture Trustee for

Trusts I-III, and Wilmington Trust is the Indenture Trustee for Trust IV.  Each of those trusts

then issued securities (collectively, "Trust I-IV Securities").  FBC also issued Contingent

Convertible Senior Notes ("the Senior Notes"), for which BNYM serves as the Indenture

---

[1] Unless otherwise noted, all docket citations refer to the 1:13-cv-1713 docket.

1

Trustee. The Senior Noteholders own the Senior Notes. HoldCo, as manager and power of

attorney for Financials Restructuring Partners, Ltd. ("FRP") and Financials Restructuring

Partners, III Ltd. ("FRP III") hold Trust II and Trust III Securities. The claimants are parties to a

series of subordination agreements that order FBC's debt as follows:

1. Senior Notes held by BNYM as Indenture Trustee for the Senior Notes
2. Debt Securities I held by BNYM as Indenture Trustee for Trust I
3. Debt Securities II held by BNYM as Indenture Trustee for Trust II
4. Debt Securities III held by BNYM as Indenture Trustee for Trust III
5. Debt Securities IV held by Wilmington Trust as Indenture Trustee for Trust IV

(*Id.*, p. 10). The Indenture agreements are governed by New York law. (1:13-cv-1755 D.I. 13-1,

§ 112).

March 12, 2009 was the bar date in this case. Wilmington Trust as Indenture Trustee for

Trust IV filed its $25,774,000 claim on account of Debt Securities IV prior to the bar date.

BNYM as Indenture Trustee for the Senior Notes filed its $83,862,000 claim on account of the

Senior Notes on November 28, 2011—more than two and a half years after the bar date.[2]

HoldCo filed claims aggregating $70 million on behalf of FRP and FRP III on account of Trust

II and Trust III Securities on June 11, 2013.

The Trustee filed his Final Report on May 29, 2013. The Final Report identified

Wilmington Trust's timely claim in the allowed amount of $26,341,880.97 receiving payment in

the amount of $7,132,398.57. (D.I. 13-1, p. 9). BNYM objected, filed additional claims on

behalf of Trusts II and III, and, for the first time, raised the argument that Wilmington Trust's

debt is subordinated to "Senior Indebtedness" based on the Subordination Provision in the

Wilmington Trust Indenture. (D.I. 13-14 at pp. P352-53; Tr. at 35-36). Specifically, BNYM

---

[2] BNYM filed its claim substantially late despite the fact that a law firm filed a Notice of Appearance as counsel for
BNYM in FBC's bankruptcy case two months prior to the bar date. (D.I. 13-1, p. 7). Indeed, BNYM's counsel
conceded at oral argument, "We completely admit, we dropped the ball." (Tr. at 16).

contends that the Senior Notes and Trusts I-III have claims under section 726(a)(3) of the

Bankruptcy Code, and that Wilmington Trust's claim on behalf of Trust IV is contractually

subordinated to the Senior Notes and other Trusts under section 510(a). (D.I. 13-1, p. 10).

HoldCo also objected to the Final Report.

After laying out the factual record, the Bankruptcy Court overruled the objections to the

Trustee's Final Report. The Bankruptcy Court began its analysis with the text of the Bankruptcy

Code. Section 726(a), in relevant part, states that, "[e]xcept as provided in section 510 of this

title," property shall be distributed in the following order:

(2) second, in payment of any allowed unsecured claim . . . proof of which is--
    (A) timely filed under section 501(a) of this title;
    . . .
    (C) tardily filed under section 501(a) of this title, if--
        (i) the creditor that holds such claim did not have notice or actual
        knowledge of the case in time for timely filing of a proof of such
        claim under section 501(a) of this title . . .
(3) third, in payment of any allowed unsecured claim proof of which is tardily filed
under section 501(a) of this title, other than a claim of the kind specified in
paragraph (2)(C) of this subsection.

11 U.S.C. § 726(a). Section 510 states that a "subordination agreement is enforceable in a case

under this title to the same extent that such agreement is enforceable under applicable

nonbankruptcy law." *Id.* § 510(a). Nonetheless, section (c) gives the court power to subordinate

all or part of an allowed claim to another under the principles of equitable subordination. *Id.* §

510(c). This scheme generally envisions the payment of timely filed claims before tardily filed

claims, subject to any contractual agreement entered into by the parties that re-prioritizes the

claims.

No party disputes that Wilmington Trust is a timely filer and entitled to priority under

section 726(a)(2)(A). There is also no dispute that BNYM's claims were tardily filed and that

BNYM had notice of the bankruptcy case. Thus, the Bankruptcy Court found that BNYM's

3

claims fall under section 726(a)(3) and are junior to Wilmington Trust's claim that is entitled to priority under section 726(a)(2)(A). (D.I. 13-1, pp. 11-12). The Bankruptcy Court then moved to the parties' contracts, which provided for the subordination of Wilmington Trust's debt. Despite the existence of the subordination provision, the Bankruptcy Court concluded that BNYM waived the right to enforce it "by sitting on its hands for 2 ½ years in connection with the Senior Notes and 4 ½ years for the remaining claims!" (*Id.*, p. 13). This "gross negligence," the Bankruptcy Court found, "would have a material adverse change to the detriment of FBC's estate and the Trustee," and could not be allowed to undermine the administering of the estate.[3] (*Id.*). In the Bankruptcy Court's oral ruling from the bench, it held in the alternative that it would equitably subordinate BNYM's claims under section 510. (D.I. 13-14, p. P380 ("So to the extent that I am wrong and the subordination agreements will be enforceable under 510(a), I find that they should be equitably subordinated to Wilmington Trust under 510(c).")). The Bankruptcy Court's later written Order (D.I. 13-1) elaborated on the waiver ruling, but did not further address the equitable subordination ruling.

The Bankruptcy Court also found that HoldCo's claims cannot be allowed against FBC because FRP and FRP III are not creditors of FBC. (D.I. 13-1, p. 12). FBC's liability is on the Senior Notes and the Debt Securities held by the Trusts. Instead, FRP and FRP III purchased Trust Securities issued by those Trusts. Therefore, the debt held by FRP and FRP III on which HoldCo filed claims is not FBC's debt. These appeals followed.

## II. LEGAL STANDARD

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). In undertaking a review of the issues on appeal, the

---

[3] During its bench ruling, the Bankruptcy Court described this as "prejudicial conduct" causing "serious prejudice to the administration of justice." (D.I. 13-14, pp. P376-78).

4

Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). In other words, this Court reviews a decision of the Bankruptcy Court in the same manner as the Third Circuit usually reviews judgments of this Court.

## III. DISCUSSION

The parties raise numerous issues on appeal. The logical way to approach this, it seems, is to decide first whether the Senior Notes have priority. If they do, which I conclude they do, that decision renders many of the other issues moot. Therefore, I need only consider waiver, equitable subordination, and the FRP entities' argument regarding a direct cause of action against FBC that is not subject to any subordination agreement.[4]

### A. Waiver

BNYM did not waive its right to assert the Subordination Provision. Contractual subordination agreements are enforceable under New York law. *See In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994). Pursuant to controlling New York precedent, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned."

---

[4] There is also a dispute regarding whether Wilmington Trust's fees are subordinated. This is not an issue the Bankruptcy Court needed to consider, and I believe it would be better for the Bankruptcy Court to address it in the first instance on remand.

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658

(N.Y. 2006). Abandonment can be shown by either affirmative conduct or a failure to act that

"evince[s] an intent not to claim a purported advantage." *Id.* Waiver "should not be lightly

presumed" and there must be "'a clear manifestation of intent' to relinquish a contractual

protection." *Id.*

There is insufficient evidence in the record to support a finding of waiver on either of the

two bases offered by the Bankruptcy Court. First, in the ruling from the bench, the Bankruptcy

Court said the subordination agreements were unenforceable "based on serious prejudice to the

administration of justice." (D.I. 13-14, p. P378). Second, the Bankruptcy Court's written Order

concluded BNYM waived its rights by "sitting on its hands" for over two years—a delay that

could only be explained by "gross negligence." (D.I. 13-1, p. 13).

To the extent prejudice is relevant to the determination of waiver,[5] it is not clear any

actually exists. The estate does not have enough money to pay any party's individual claim in

full—both BNYM and Wilmington Trust's claims exceed the roughly $7 million available for

distribution. All parties agree that if BNYM had filed a timely claim it would have received first

priority because of the Subordination Provision. Wilmington Trust cannot maintain that it is

prejudiced by BNYM enforcing its rights in a manner consistent with the contract; quite to the

contrary, the Bankruptcy Court acknowledged its ruling provided Wilmington Trust with a

"windfall to a certain extent, because there is no question that in the ordinary course, they would

have been subordinated to all these other claims." (D.I. 13-14, p. P378). Moreover, I do not

believe the record reflects that there is any substantial prejudice to the Trustee caused by BNYM

filing its claim late, but prior to the Trustee's distribution of funds. The Trustee will merely have

---

[5] No party cites any "waiver" case purporting to apply New York law which makes prejudice a part of the analysis. (*See, e.g.*, D.I. 23 at 7-11).

to write a check in the same amount to BNYM as he would have had to do to Wilmington Trust. It is pure speculation to posit, as Wilmington Trust suggested at oral argument (Tr. at 60-63), that the Trustee would have done something differently with respect to the FDIC settlement and the D&O litigation if he knew there were additional claims. My understanding of the Trustee's duties in a chapter 7 bankruptcy is that he is required to maximize the money in the estate, regardless of the number or amount of claims.

Although inaction in certain circumstances could give rise to a waiver, the facts here do not support that finding. Every party, including BNYM, acknowledges that BNYM should have timely filed its claims, and the delay caused by BNYM's conduct is understandably frustrating for everyone involved. Nevertheless, BNYM's failure to act did not rise to the level of a "'clear manifestation of intent' to relinquish a contractual protection," nor did it constitute a "knowing[], voluntar[y] and intentional[]" abandonment of its contractual rights. *See Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 658. I do not read the Bankruptcy Court's Order as having concluded this as a factual matter. To the extent the Order can be read in that manner, the factual finding is clearly erroneous.[6]

## B. Equitable Subordination[7]

If BNYM's claims were equitably subordinated under section 510(c), that subordination constitutes clear error. Prior to a court invoking the power of equitable subordination, the Third Circuit requires the satisfaction of three conditions: "(1) '[t]he claimant must have engaged in some type of inequitable conduct;' (2) '[t]he misconduct must have resulted in injury to the

---

[6] It is also worth noting that the waiver argument was not advanced in the Bankruptcy Court by any party, and the Bankruptcy Court's Order did not address the "no waiver" provision found in the subordination agreements.
[7] Although equitable subordination was not mentioned as a ground for overruling objections to the Trustee's Final Report in the written Order, the Bankruptcy Court raised it as an alternative justification in its bench ruling. Therefore, it merits consideration here as a basis for upholding the Court's Order.

7

creditors of the bankrupt or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].'" *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (alterations in original).

There is no evidence of inequitable conduct here. The applicable standard is different for insider claims and non-insider claims. Equitable subordination of a non-insider claim, such as those of BNYM and the Senior Noteholders, requires "evidence of more egregious conduct such as fraud, spoliation or overreaching." *Id.* at 412. The basis for the Bankruptcy Court's finding of inequitable conduct appears to be that BNYM waited too long to enforce the subordination agreement. (D.I. 13-14, p. P380 ("What's inequitable about it is this whole concept of sitting on your hands and doing nothing for [a long time]. To dig in and then come into Court and ask for the enforcement of these types of rights, I think in and of itself is inequitable."). However, the Bankruptcy Court found that BNYM's conduct was attributable to "negligence" or "gross negligence," not willful actions. (*Id.*, pp. P379-80). In my opinion, even gross negligence does not rise to the level of fraud, spoliation, or overreaching that is required to establish inequitable conduct. *See, e.g., Md. Nat'l Bank v. Vessel Madam Chapel*, 46 F.3d 895, 901 (9th Cir. 1995) ("Inequitable conduct sufficient to support equitable subordination cannot be based on mere negligence, as the district court held, or indifference."); *Blaine-Hays Constr. Co. v. Union Planters Nat'l Bank (In re Edgewater Motel, Inc.)*, 121 B.R. 962, 973 (Bankr. E.D. Tenn. 1988) (declining to equitably subordinate a claim when "[t]he conduct which damaged the plaintiff in the instant case was negligent conduct. It was neither intentional misconduct nor substantial misconduct").

8

The record evidence is also insufficient to support a finding of harm. The subordination of a claim is only appropriate "to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *In re Winstar*, 554 F.3d at 413. Because I found that there is no inequitable conduct, there can be no resulting harm incurred by the estate or its creditors. If my conclusion that there is no inequitable conduct is incorrect, there is still no evidence of harm, as discussed in my analysis of the waiver issue above.

Finally, it seems to me that applying equitable subordination here based solely on lateness is inconsistent with the Bankruptcy Code. Section 726(a) expressly contemplates the tardy filing of claims. As a result of not meeting the bar date, those claims are relegated to a lower priority position—that is the "punishment" for being late. Section 726 is explicitly subject to section 510, which permits the use of subordination agreements to the extent they are enforceable under applicable nonbankruptcy law. Therefore, parties can agree that even late-filed claims can be subordinated to timely claims, as was the case here. To equitably subordinate a claim for tardiness alone, in my mind, is inconsistent with the statutory interplay between sections 726 and 510, and a violation of the contractual framework entered into by the parties for prioritizing the claims in this bankruptcy proceeding. Something more than extreme tardiness is required before BNYM's claim can be equitably subordinated. Thus, to the extent BNYM's claim was subordinated due to inequitable conduct, I conclude that the finding of inequitable conduct cannot be sustained based on the factual record.

## C. FRP and FRP III's Claims

The Bankruptcy Court ruled that FRP and FRP III are not creditors of FBC and therefore lack standing. The Bankruptcy Court succinctly rejected HoldCo's argument as follows:

> But, Claim Nos. 26 and 27 cannot be allowed against FBC because Holdco and its affiliate are not creditors of FBC. FBC's liability is on the Senior Notes and

9

the Debt Securities held by the relevant Trusts. Those Trusts, in turn, issued Trust
Securities that were [bought] by Holdco and its affiliates. Thus, the debt identified
in ¶¶ 10 and 11(c) as held by Holdco and its affiliate is not FBC's debt. The "real"
creditor in relation to these claims is BNYM, which filed unsecured but tardy
claims as Indenture Trustee of Debt Securities issued by FBC. Holdco and its
affiliate lack standing to assert BNYM's claims . . . .

(D.I. 13-1, p. 12). On appeal, only the Trustee defends the Bankruptcy Court's ruling on

standing. (1:13-cv-1716 D.I. 18, p. 9). The other interested parties express no opinion on the

matter. (*See, e.g.*, 1:13-cv-1716 D.I. 20 at 10 ("Wilmington [Trust] takes no position in this

appeal as to whether a holder of TruPS is a creditor with standing to assert the positions

advocated by FRP herein."); 1:13-cv-1716 D.I. 16 at 11 ("The Senior Noteholders do not opine

as to whether the FRP Creditors would have any plausible claim against the Debtor under either

argument."); 1:13-cv-1716 D.I. 17, p.7 (BNYM glosses over the standing issue)).

HoldCo argues that FRP and FRP III, as holders of Trust II and Trust III Securities, are

granted direct standing against FBC by virtue of Section 2.8(e) of the Trust Declaration, which,

in relevant part, states:

[I]f an Event of Default has occurred and is continuing and such event is attributable
to the failure of the Debenture Issuer to pay interest or premium, if any, on or
principal of the Debentures on the date such interest, premium, if any, or principal
is otherwise payable, . . . then a Holder of the Capital Securities may directly
institute a proceeding for enforcement of payment to such Holder of the principal
of or premium, if any, or interest on the Debentures having a principal amount equal
to the aggregate liquidation amount of the Capital Securities . . . .

(1:13-cv-1716 D.I. 13-9, pp. 0273-74; 1:13-cv-1716 D.I. 12, p. 9). Section 2.8(e) allows a

"Holder" to directly institute a proceeding, and the Trust Declaration defines "Holder" as "a

Person in whose name a Certificate representing a Security is registered." (1:13-cv-1716 D.I.

13-9, p. 0263). There is no dispute that the Trust Securities are not registered in the FRP

entities' names—FRP and FRP III are the beneficial holders of the Trust Securities, and BNYM

and U.S. National Bank National Association ("USB") are the registered holders. (1:13-cv-1716

D.I. 13-6, p. 0127-28 (listing BNYM as custodian of Trust II and Trust III Securities); 1:13-cv-1716 D.I. 13-7, p. 0141 (listing USB as custodian for Trust III Securities); *see also* 1:13-cv-1716 D.I. 12, p. 13 n.4 (acknowledging that BNYM and USB, as custodians of the Trust Securities, are the registered holders)). Section 2.8(e) does little to advance HoldCo's argument that the FRP entities have standing because they are not a "Holder" as defined by the Trust Declaration.

According to HoldCo, the New York Supreme Court has nonetheless affirmed direct standing based on similar trust declarations. *See Financials Restructuring Partners III, Ltd v. Riverside Banking Co.*, 2014 N.Y. Misc. LEXIS 36 (N.Y. Sup. Ct. Jan 2, 2014). That case is distinguishable, however, because the nominee of the registered Holder "authorized FRP[, the beneficial holder,] to continue this action and consented to be named as a nominal party." *Id.* at 9. Indeed, the court expressly stated that, "[b]ecause FRP has been authorized to sue as beneficial holders of the Capital Securities," it "need not reach the questions of whether the Trust necessarily dissolved on the occurrence of an Event of Default and *whether FRP can sue on the Debentures.*" *Id.* (emphasis added). HoldCo's arguments do not persuade me that the Bankruptcy Court erred in finding the FRP entities lacked standing.

Even if the FRP entities do have standing to bring a direct action, HoldCo's argument on the merits strikes me as being completely meritless. The Debentures referred to in section 2.8(e) are Junior Subordinated Debt Securities issued to the respective Trusts which are governed by the subordination provisions in the Indentures. (1:13-cv-1716 D.I. 13-9, p. 0327 ("Each Holder of the Capital Securities and the Common Securities, by the acceptance of such Securities, agrees to the provisions of the Guarantee, including the subordination provisions therein and to the provision of the Indenture.")). Thus, any direct claim by the FRP entities against FBC is one for the payment of debt subordinate to that of the Senior Noteholders. FRP and FRP III are

11

essentially stockholders of a company financed by FBC's junior debt and cannot, like

Rumplestiltskin, turn straw into gold and leapfrog ahead of the actual holders of more senior

debt.

## IV. CONCLUSION

For the reasons stated above, the Orders of the Bankruptcy Court are vacated and

remanded for consideration consistent with this Memorandum Opinion.  An appropriate Order

will follow.

12